UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

ORANGE ROSE, LLC                    Case No. 8:10-bk-24856-MGW
d/b/a STARLITE MOBILE               Chapter 11
HOME PARK,

     Debtor.
_____/

**MEMORANDUM OPINION AND ORDER ON CREDITOR
MONTANARO'S MOTION FOR RELIEF FROM STAY**

     Section 319.22 of the Florida Statutes has long mandated that title to a motor vehicle or mobile home cannot pass until a certificate of title is issued to the new owner. Florida case law, however, has created an equitable exception to this requirement that applies when the original titleholder entrusts a vehicle to a dealer who has either express or implied authority to sell the vehicle and thus transfer the titleholder's interest to innocent third parties. In this case, the Debtor, who purchased thirty-seven mobile home trailers from Angelo C. Montanaro ("Montanaro") in May 2009, simply failed to submit the bills of sale and transfers of title to the Florida Department of Highway Safety and Motor Vehicles ("DHSMV") in compliance with section 319.22 of the Florida Statutes. There is no equitable exception to compliance with this requirement that applies under these circumstances. Accordingly, because the Debtor, as a purchaser, failed to comply with the requirements of section 319.22,[1] this Court must strictly enforce its mandate and find that ownership remains with the seller, Montanaro.

---

[1] Fla. Stat. § 319.22(1) (2008).

Factual and Procedural Background

The Debtor owns and operates a mobile home park known as the "Starlite Mobile Home Park" ("Park"). The Park contains approximately seventy-two mobile home trailers that the Debtor leases to various tenants.[2] Montanaro has filed a Motion for Relief from Stay[3] ("Motion") concerning the thirty-seven mobile home trailers ("Units") that Montanaro contends he still owns and are, therefore, not property of the bankruptcy estate.

There is no question that as of May 2009, Montanaro owned the Units located in the Debtor's Park. When a dispute arose between Montanaro and the Debtor concerning the operation of Montanaro's Units, Montanaro filed a state court lawsuit seeking damages and injunctive relief based on the Debtor's alleged tortuous interference with a business relationship, trespass, and violations of Chapter 723, Florida Statutes—the Florida Mobile Home Act[4]. The parties settled this lawsuit as is documented in their Stipulation and Settlement Agreement ("Settlement Agreement") executed May 29, 2009.[5] Under the Settlement Agreement, Montanaro agreed to sell the Units to the Debtor for $600,000. This seller-financed transaction was to be evidenced by a $600,000 promissory note payable to Montanaro and secured by a lien on the Units.[6] The parties agreed that the Debtor would rent out the units to third-party tenants and that Montanaro would serve as the Debtor's leasing agent responsible for maintenance and repair of the Units.[7]

---

[2] *Debtor's Schedule B – Personal Property* (Doc. No. 32 at 6).

[3] Doc. No. 19.

[4] Fla. Stat. § 723.001.

[5] Joint Ex. 3.

[6] *Id.,* Exhibit D – *Promissory Note*.

[7] *Id.* ¶ 3.

The Settlement Agreement specifically identified three separate procedures required for the conveyance, payment, and security of payment associated with the sale. First, it required Montanaro to deliver to the Debtor within five days both the "Notice of Sale and/or Bill of Sale for a . . . Mobile Home"[8] and the Certificates of Title for each of the Units.[9] The Debtor was then solely responsible "for filing the transferred Certificates of Title with the State of Florida Department of Motor Vehicles" and for paying all costs associated with the filings and "all annual title and registration fees, costs and taxes of any kind whatsoever associated with the Units."[10] Second, the Settlement Agreement required the Debtor to execute the $600,000 promissory note payable to Montanaro, which the Debtor did contemporaneously on May 29, 2009.[11] And third, it provided that the promissory note "shall be secured by a lien on the Units, utilizing a form promulgated by the Florida Department of Motor Vehicles."[12]

In compliance with the Settlement Agreement, Montanaro delivered the fully executed set of documents to the Debtor in December of 2009. For each of the Units, the executed documents included three DHSMV forms: a "Notice of Sale and/or Bill of Sale" executed on December 16, 2009; an original "Certificate of Title" reflecting that the sale took place on May 29, 2009; and an "Application for Notice of Lien."[13] While the set of documents that Montanaro delivered contained all the required information (including Montanaro's signature) and identified the Debtor as either the purchaser or new registered owner as appropriate, they still required the

---

[8] Joint Ex. 3, *Exhibit C – FDMV Form Bill of Sale*.

[9] Joint Ex. 3 ¶ 2(a).

[10] *Id.*

[11] *Id.* at ¶ 2(b).

[12] *Id.* at ¶ 2(c) (referencing *Exhibit E – FDMV Lien Form*).

[13] Joint Ex. 12.

Debtor's signature.[14] The Debtor did not, however, sign and forward the executed documents to the DHSMV in December 2009.

In February 2010, based on alleged breaches by the Debtor under the Settlement Agreement, Montanaro filed a state court action seeking (1) damages under the $600,000 promissory note, (2) damages for breach of contract for the Debtor's failure to distribute part of the net monthly rents as specified in the Settlement Agreement, and (3) specific performance for certain obligations imposed upon the Debtor under the Settlement Agreement, including the requirement that the Debtor execute and deliver to Montanaro liens for each of the units that would allow Montanaro to create and subsequently perfect his security interest in the units.[15] In fact, the Debtor never did execute and deliver the liens on the units to the DHSMV, nor did the Debtor file the Notices of Sale of the Units so that the new Certificates of Title to the Units could be issued in the Debtor's name as the Settlement Agreement required.

On March 31, 2010, the state court entered a final default judgment against the Debtor.[16] In accordance with the terms of that final judgment, the Debtor was required to perform certain actions that included the execution and delivery of the notice of lien forms for each of the Units.[17]

## Conclusions of Law

The Court has jurisdiction to determine the Motion for Relief from Stay pursuant to 28 U.S.C. § 1334(b) and 11 U.S.C. § 362. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

---

[14] *Id.*

[15] Joint Ex. 4.

[16] Joint Ex. 10, *Exhibit A – Final Default Judgment*.

[17] *Id.* ¶ 3(a).

Section 319.22 of the Florida Statutes governs transfers of title of mobile homes such as those involved in this case. Specifically, this provision provides as follows:

> (1) . . . [A] person acquiring a . . . mobile home from the owner thereof . . . shall not acquire marketable title to the . . . mobile home until he or she has had issued to him or her a certificate of title to the . . . mobile home . . . . Except as otherwise provided herein, no court shall recognize the right, title, claim, or interest of any person in or to any . . . mobile home sold . . . unless evidenced by a certificate of title duly issued to that person, in accordance with the provisions of this chapter.[18]

A.   Cases Finding an Equitable Exception to Section 319.22(1) of the Florida Statutes

While this statutory provision appears to be clear in its mandate that title cannot pass until a certificate of title is issued, there is a body of case law that has emerged under which an equitable exception to this requirement can be recognized. The leading case among these is the 1957 Florida Supreme Court case of *Motor Credit Corporation v. Woolverton*.[19]

In *Woolverton*, a dealer sold a new house trailer to one Houghtaling under a conditional sales contract, which the dealer then assigned to a finance company. The finance company duly recorded its lien on the vehicle title. When the purchaser subsequently defaulted and returned the trailer back to the dealer, the dealer then sold it to Mrs. Woolverton, who paid for the trailer in full. Unfortunately, the dealer did not remit the cash payment to the finance company, which accordingly refused to release its lien or transfer title, thus leaving Mrs. Woolverton without title to the trailer.

In subsequent litigation between Mrs. Woolverton and the finance company, the finance company relied on section 319.22, which provides, as noted above, that no court may recognize the interest of any person in a trailer "unless evidenced by a certificate of title." In rejecting the

---

[18] Fla. Stat. § 319.22(1).

[19] 99 So. 2d 286 (Fla. 1957).

5

finance company's reliance on this statutory requirement, the Florida Supreme Court relied on a long-standing principle of law that

> [When] an owner consigns personal property to a dealer in such goods with express or implied authority to sell, . . . a purchaser, who pays value for such goods and gets possession thereof without notice of the terms or conditions of the original delivery, consignment, or sale, obtains good title as against the original owner, [notwithstanding the owner's reservation of title].[20]

In fact, this concept has been codified in Florida Statutes Chapter 672, Florida's Uniform Commercial Code, which provides that

> [a]ny entrusting of possession of goods to a merchant who deals in goods of that kind gives the merchant power to transfer all rights of the entruster to a buyer in [the] ordinary course of business.[21]

As to the effect of section 319.22, the Florida Supreme Court in *Woolverton* noted that "the failure of the purchaser to obtain the title certificate at the time of sale does not prevent the passage of title from the seller to the buyer."[22] While the statute provides that a purchaser shall not acquire "marketable" title until a certificate of title is issued, "the statute 'does not provide that no *valid* title shall be perfected' until [that time]."[23] As stated by the Supreme Court,

> In these circumstances to allow the finance company to take advantage of the purchaser's not having a title certificate would be about as inconsistent as to allow the culprit who murdered his father and mother to beg for mercy on the ground that he was an orphan.[24]

---

[20] *Id.* at 288 (quoting *Glass v. Cont'l Guar. Corp.*, 88 So. 2d 879 (Fla. 1921)).

[21] Fla. Stat. § 672.403(2) (2008).

[22] *Woolverton*, 99 So. 2d at 290.

[23] *Id.* (quoting *Hamner v. Domingue*, 82 So. 2d 105, 107 (La. Ct. App. 1955) (evaluating the Louisiana statute that contained similar language preventing "marketable" title from passing to a purchaser until a certificate of title is issued) (emphasis in *Hamner*).

[24] *Id.* at 291.

In 1974, the Florida Supreme Court revisited this issue in the case of *Greyhound Rent-A-Car Inc. v. Austin*.[25] The *Greyhound* case involved a car rental company that regularly placed its older vehicles with an automobile dealer for purposes of sale to the public. Under this arrangement, the rental car company would remain the title holder until it was paid in full after a consumer purchased the car from the dealer. In the *Greyhound* case, Austin bought the car and paid the dealership, but unfortunately the dealership did not pay Greyhound. As a result, Austin never received title. As in *Woolverton*, in subsequent litigation between the car purchaser and the titleholder, *Greyhound* relied on Florida Statute 319.22(1) for the proposition that title cannot pass until an actual certificate of title was received from the DHSMV.

In rejecting Greyhound's argument, the Florida Supreme Court looked to *Woolverton* as the controlling case. The court noted that there is an equitable exception to the statutory requirement based on the titleholder's participation in the establishment of and benefits from the procedure set up for disposing of the titleholder's cars to the public. Where the titleholder creates a hazard that could have been avoided by the slightest notice or warning to the public, the titleholder cannot later claim ownership in derogation of the rights of innocent third parties that purchase vehicles without knowledge of the titleholder's retention of title. As restated in *Greyhound*,

> if the mortgagee clothes the mortgagor with indicia of ownership, or gives him authority to sell the property, or stands by in silence and watches the mortgagor deal with it as owner, he nullifies the effect of recording by his inconsistent representation.[26]

---

[25] 298 So. 2d 345 (Fla. 1974).

[26] *Id.* at 347 (quoting *Woolverton*, 99 So.2d at 289).

B. Cases Requiring Strict Compliance with Section 319.22(1) of the Florida Statutes

In 1987, the Florida Supreme Court considered a decision by the Florida Fifth District Court of Appeal that reviewed a claim of equitable exception to section 319.22 in the context of a forfeiture proceeding. In the case of *Lamar v. Wheels Unlimited Inc.*,[27] the Fifth District held that the trial court erred when it did not consider a possible equitable argument made by a corporation that claimed to have acquired title to the vehicle at issue. The corporation had acquired the vehicle as a capital contribution, but it had never formally transferred the title to the corporation. In quashing the Fifth District's ruling, the Florida Supreme Court held that because the corporation seeking to contest the forfeiture did not have a certificate of title to the automobile, it did not have standing to contest the forfeiture. Reaching this conclusion, the Supreme Court held that

> we do not believe that the legislature intended that unrecorded equitable claims of ownership should be treated differently than liens in forfeiture proceedings. Because [the claimant] did not hold a certificate of title to the automobile, it did not have standing to contest the forfeiture.[28]

In *Green Tree Acceptance, Inc. v. Zimerman*, Florida's Second District Court of Appeal considered another case in which the buyer failed to comply with section 319.22.[29] While the *Greentree* court considered the *Woolverton* holding in reaching its decision, the facts of *Greentree* were materially different from those involved in *Woolverton* resulting in the opposite conclusion. In *Green Tree*, a first dealer sold the motorhome to the first purchaser under a conditional sales contract, which was then assigned to the financing company, Green Tree. The first purchaser later traded in the motorhome to a second dealer without Green Tree's knowledge

---

[27] 513 So. 2d 135 (Fla. 1987).

[28] *Id.* at 138.

[29] 611 So. 2d 608 (Fla. 2d DCA 1993).

and without paying off the Green Tree lien or obtaining the title. The second dealer subsequently sold the motorhome to the Zimermans, who then filed an action against Green Tree seeking a declaration that their rights were superior to those of Green Tree.

In rejecting the Zimerman's argument that the case was controlled by *Woolverton*, the Second District noted the material factual difference between the cases. The financing company, Green Tree, had no relationship with the second dealer and certainly had taken no action to entrust vehicles with the second dealer such that the entrustment doctrine might apply. As stated by the court, the entrustment provision contained in section 672.403 does not apply "unless the lien holder entrusts possession of the motor vehicle to a merchant or acquiesces in such entrusting by the owner."[30] Because the equitable entrustment doctrine did not apply, the *Green Tree* court found that section 319.22 required the purchaser to obtain a title certificate at the time of sale in order to obtain title to the vehicle.[31]

Another case in which a court enforced the provisions of section 319.22 and rejected an argument of equitable ownership was the bankruptcy case of *In re Coburn*.[32] The *Coburn* case involved a chapter 7 bankruptcy trustee's motion for turnover of a motor vehicle titled in the debtor's name. In opposition to the motion, the debtor contended that his father had an equitable interest in the vehicle as either an owner or a lien holder. This argument was based on the fact that the father had obtained an unsecured loan to assist the son in purchasing the vehicle, and the father had made substantially all of the loan payments. The vehicle, however, was always titled and registered in the son's name. While the son had endorsed and deliver the original title to the

---

[30] *Id.* at 610.

[31] *Id.*

[32] 250 B.R. 401 (Bankr. M.D. Fla. 1999).

9

father, the father had never recorded the transfer of the truck to him requesting a new certificate of title from the State of Florida.

Importantly, the *Coburn* case did not involve any issues of entrustment. It was simply a case of a party not complying with the requirements of section 319.22. Based on this, the bankruptcy court held that the Florida statute was not ambiguous and required compliance with Chapter 319 as a condition of transfer of title of motor vehicles in Florida.[33] Because the father had held the endorsed title for three years without recording his interest, he lacked standing to assert any claim as to the vehicle after the son filed for bankruptcy.

C.     Application to this Case

We conclude, therefore, that as a general proposition section 319.22 is to be strictly enforced. The exception that has arisen under the case law to strict enforcement of this provision is a narrow category of cases when third parties have relied on the apparent authority of someone in possession of goods to deliver good title of those goods such as arises in the entrustment cases. In those cases, the titleholder, typically the finance company who facilitated and benefited from its relationship with a dealer, cannot later take advantage of the purchasers that did not obtain the title certificate.[34]

---

[33] *Id.* at 404.

[34] The only case cited by the parties that did not strictly enforce the requirements of section 319.22 and did not involve entrustment or any other action that would equitably estop the titleholder from claiming ownership is the case of *In re Forfeiture of $7464 and 2002 Cadillac Escalade*, 872 So. 2d 1017 (Fla. 2d DCA 2004). The issue in that case was whether the title holder of a vehicle had standing to contest the forfeiture of the vehicle after it had been seized by law enforcement as a result of its use in a drug sale. The party claiming ownership had nothing to do with the drug sale but had previously sold and delivered possession of the vehicle to the drug dealer, had dropped all insurance coverage, and—most importantly—had been fully paid $32,000 for the vehicle. Because the drug dealer failed to comply with Florida statute section 319, the drug dealer was not technically the titleholder to the vehicle at the time of the forfeiture proceeding. The Second District Court of Appeal rejected the title holder's claim of ownership citing the *Green Tree* case for the proposition that "the purchaser's failure to obtain the title certificate at the time of sale does not, however, prevent the passage of title from the seller to the buyer." *Id.* at 1019 (emphasis omitted) (citing *Green Tree* 611 So. 2d at 610).

For example, if in this case, the Debtor had sold one of the Units to a tenant of the Park, in litigation between Montanaro and the tenant, the tenant would prevail. As in *Woolverton* and the cases following *Woolverton*, Montanaro participated in the transaction that gave the Debtor apparent authority to sell the unit.  Thus between Montanaro and an innocent tenant purchaser, the tenant purchaser would prevail. That is not the situation here. This is a straightforward sale in which the Debtor as purchaser simply failed to forward the certificates of title and related documents to the DHSMV so that a new certificate of title could be issued in the purchaser's name. Certainly the Debtor cannot be heard to complain about its own failure to comply with 319.22.

Moreover, if this Court were to hold that under the circumstances it would be appropriate to invoke equitable principles and find that the Debtor is the owner of the Units, the result would be that the Debtor would end up owning the units free and clear of Montanaro's security interest. This is because a debtor in possession, acting as a bankruptcy trustee, has the strong arm powers to avoid an unperfected security interest.[35] It would be clearly inequitable to allow the Debtor to benefit from its failure to perform its agreement to record the bills of sale and notices of lien.

## Conclusion

For the above reasons, it is this Court's conclusion that the Units are owned by Montanaro and not by the Debtor.  Accordingly, it is

---

The *2002 Cadillac Escalade* case appears to be driven by bad facts and is not consistent in its holding with the Supreme Court precedent cited above. The bad facts were that someone who had been fully paid $32,000 for an automobile would be able to reclaim the car from a drug-related forfeiture proceeding. Based on the other precedent cited above, it is this Court's conclusion that the Florida Supreme Court would not rule similarly if presented with the same facts as those arising in *2002 Cadillac Escalade* forfeiture case.

[35] 11 U.S.C. § 544.

**ORDERED:**

1. The Motion is GRANTED subject to this Court's further clarifying the scope of the relief to be afforded to Montanaro.

2. The Court will conduct a further hearing to consider further appropriate relief on March 16, 2011, at 10:30 a.m.

3. The parties are ordered to meet and confer, or alternatively, schedule mediation before the next scheduled hearing.

4. In the interim, Montanaro may proceed to rent the Units to third-party tenants.

**DONE** and **ORDERED** in Chambers at Tampa, Florida, on February 16, 2011

_____
Michael G. Williamson
United States Bankruptcy Judge